The evidence showed that three days before the death of testator, who was a paralytic, his wife notified his attorney that testator would like to see him, and on the arrival of the attorney left him with the testator in the sick room with the nurse who had attended him for some time. Testator being unable to speak, the nurse interpreted for him to the effect that he wished to change his will, whereby he increased a bequest to the nurse from $1,000 to $8,000. The testator carefully read over the codicil, when prepared, before he signed it, and the attorney testified that testator was in sound mind. The wife of the testator knew that he sent for the attorney with intent to change his will. *Held*, that the will would not be set aside on the ground of undue influence or mental incapacity.

In the matter of the probate of the will of John Lacy, deceased. Probate decreed.

Lemuel Skidmore, for petitioner.
Mayer & Gilbert, for Ellen Healy, a legatee.
Ormiston & McCormack, for contestants.

FITZGERALD, S. The decedent died on the 12th of January, 1901, at the age of 74, leaving a widow and children. By his will, executed in November, 1896, and a codicil, executed in 1899, his widow and children receive the bulk of his very considerable estate.

By a second codicil, which is contested, and which was executed a few days prior to his death, he increased a legacy given by the will to his nurse and attendant, from $1,000 to $8,000. The contest is confined to the last paper. On the morning of the 9th of January, 1901, the widow wrote to Mr. Skidmore, stating that Mr. Lacy, the testator, would like to see him at once. She testified that she sent to him for the purpose of having a codicil drawn to his will, though she did not tell him that this was the purpose for which he had been summoned. She says it was her belief·that the testator intended to prepare a codicil in favor of her daughter Camilla. Mr. Skidmore testified that in response to this letter he called at the residence of the testator, and found him in bed. The nurse was with him in the room at the time. She aroused him, got him upon his feet, assisted him towards the middle of the room, where there was an armchair, and seated him. The witness noticed that the testator's paralysis or palsy had increased, particularly as respected his speaking. He attempted to speak, but the lawyer could not understand him, and then the nurse spoke to him, and interpreted for him to the effect that he wanted to make a change in his will. He tried to find out what the change was to be, and, through her interpretation, was told that he wished to leave her an increased sum over that which he had left her in the will, the original sum being $1,000, and he wished to increase it to $8,000. Becoming a little uneasy at being alone with the testator and the person he sought to benefit, he managed to have Mrs. Healy go out of the room, when he spoke to Mr. Lacy, and endeavored to communicate with him directly. When the nurse departed from the room, the testator complained of the somewhat summary manner in which she had aroused him from his slumber and assisted him to his chair, saying: "She treats me as if we were man and wife. It is hardly decent." The draftsman of the will asked him whether it was his wish to make this gift to Mrs. Healy, and to the best of his understanding the testator appeared to comprehend the question, and replied that it was. He asked him if he did it of his own free will, or whether he had been in any way forced into doing it, or overpersuaded or teased, and he understood him to say that he did it of his own free will, and wished to do it. Thereupon, realizing that he was a sick man, and that there was no time to be lost if anything was to be done, and yet with some hesitation on account of the circumstances, he sat down and drew this codicil in his own handwriting. When it was done he handed it over to him. While he was doing so, Mrs. Healy, who had returned, helped him over to a small table near the window, on which there were writing materials. He sat down on a chair, with her assistance, in front of it, and attempted to sign his name to the document. Before attempting to sign, the witness testifies that decedent evidently read it over himself with care while he sat at the table. When witness was asked, on cross-examination, why he considered the testator to be of sound mind, he states that he reached that conclusion from all the circumstances combined; that he was largely influenced by 'the fact that he had received a request from Mrs. Lacy, the widow, to go there. He

thought that she would not have sent for him unless she knew the purpose of the visit. He was also actuated by the fact that he was not interfered with by any of the family, and their seeming understanding of the business for which he was present. The testimony of the draftsman with reference to the ability of the testator to comprehend conversation addressed to him, and to communicate his ideas to others, is confirmed by the other subscribing witness and Miss Walsh. The dominant feature of this contest is that the active contestants of this codicil participated in its execution by procuring the attendance of the draftsman with a knowledge of the purpose for which he came. It is only after they discovered that their expectations were disappointed that they declare that the testator was incompetent, and was unduly influenced in its execution. The testimony of the draftsman who superintended the execution of the contested paper was characterized by extreme diffidence. He told the widow afterwards that if he had known, before the codicil was executed, the facts as she stated them in relation to the occurrences about the time of its execution, he would never have been concerned in the execution of the codicil without her or some of her family being present in the room. I am satisfied that the impression created upon his mind is correct, that the difficulties of the testator in his conversation were purely physical, and that his mind was sufficiently strong to understand the nature of the act he performed. In the case at bar, as in Re Bonner's Will, 33 Misc. Rep. 9, 67 N. Y. Supp. 1117, "there are lacking many of the elements which frequently accompany the domination of one mind over another in procuring a testamentary disposition of property. No effort appears to have been made to prevent free access to the testator by the persons who are alleged to have been discriminated against in the instrument. * * * The terms of the codicil are not grossly unjust, or the division unequal." On the contrary, it conforms to his previously expressed desire to reward the beneficiary for her long years of devotion, and the legacy is not disproportionate. The "prominent and commanding figure" of the nurse in the household affairs complained of may have been due to the abdication by the widow of her wifely position and duties, rather than to any unwarranted assumption or interference on her part. The assertion of undue influence is disproved by the prior life, conduct, and character of the testator before and during his illness, and up to the very day before the contested paper was executed. A decree may be submitted admitting the codicil to probate.

Probate decreed.